In re Robert W. MCNAMARA, Debtor.

Roberta Napolitano, Trustee, Plaintiff,

v.

Robert W. McNamara, Defendant.

Bankruptcy No. 99–50271.
Adversary No. 99–5086.

United States Bankruptcy Court,
D. Connecticut.

June 16, 2004.

Larry F. Ginsberg, Stamford, CT, for the debtor/defendant.

Roberta Napolitano, Weinstein, Weiner, Ignal, Napolitano & Shapiro, P.C., Bridgeport, CT, Pro se.

## MEMORANDUM AND DECISION ON DISCHARGE OF DEBTOR

ALAN H. W. SHIFF, Bankruptcy Judge.

The trustee filed the instant adversary proceeding, seeking the denial of the debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), & (a)(5). The complaint is based on the loss of $150,000 from the debtor's estate and his unsubstantiated explanation that he lost most of that money in a gambling spree. For the reasons that follow, the debtor's discharge is denied under 11 U.S.C. §§ 727(a)(2)(A) and (a)(5). Since the applicability of 11 U.S.C. § 727(a)(3) is moot, that section is not discussed.

### Background

The debtor was the only witness at the trial. He testified that he had $150,000 in a briefcase as a result of numerous withdrawals from bank accounts during the summer of 1998 and that immediately after he was ordered to deposit the money in an escrow account,[1] he gambled $130,000 in a winner-take-all stud poker game at a private residence in Brooklyn, New York. He was not able to provide any further details about the poker game except that someone, who no longer lives in the country, drove him there. In an effort to explain his failure to remember details, the debtor

---

1. On or about September 17, 1998, the debtor was ordered by a judge of the Superior Court of the State of Connecticut to deposit $150,000 in an escrow account pending the outcome of his divorce proceedings. When the debtor failed to deliver the money, the state court issued a *capias,* and he was arrested on December 24, 1998. On that day, he testified that he had lost $130,000 gambling and spent another $20,000 on a vacation trip to the Caribbean.

claimed that he was under the influence of alcohol and medication for severe depression. He further stated that he had just lost his job and had been taken to a hospital in New York with what he initially thought was a second heart attack. He did not, however, produce any evidence to corroborate that claim, such as medical or hospital records or the testimony of anyone who witnessed his condition. The debtor testified that he reserved enough money to pay for a Caribbean vacation, which was supported by receipts from that trip. (Ex. D). He denied that he deposited any money into offshore bank accounts.

Apart from his difficulty to recall the details of the poker game, the debtor's credibility was also challenged by an unlikely difficulty recalling the details of significant bank account deposits and withdrawals prior to and concurrent with the alleged gambling losses. For example, he was unable to remember the source of an October 14, 1998 deposit of $44,247.87. He speculated that it was either from life insurance policies, despite testimony that other deposits were from those policies, or from his salary, even though it was a single large deposit, and he claims to have lost his job more than a month earlier. The debtor was also unable to credibly testify how he spent over $200,000 between June 1998 through February 1999. For example, he claimed that he spent a part of that money on renovations to his former marital residence, but the trustee reminded him that the property was sold in May 1998.

The evidence justified the trustee's suspicion that the debtor's claimed gambling loss is a fictional attempt to hide money that he considered to be his and not subject to his former wife's claims. He testified that he had an agreement with her that they would separate for five years rather than get divorced, so that he could maintain his health insurance through her employment. That issue was prompted by the debtor's claim that he was told he would require a heart transplant in the future. In return for her agreement, he claims to have agreed to give her custody of the children and repair the marital residence. The debtor testified that after she repudiated the agreement, he believed he was entitled to the $150,000:

> I told her that if that was the case, that if she would not change her mind and go along with the agreement, that I would be forced to sell the house, take the $150,000 that I felt was mine . . . .
>
> . . .
>
> I begged her . . . to reconsider and go along with the agreement . . . . She refused; was insistent on a divorce.

(Tr. of 11/8/00 at 77).

> I told my wife what I felt was my share of the marital home because I had taken a buyout . . . and my income savings accounts would total 150 . . . .

(Tr. of 11/8/00 at 54).

> I told her that I would take my monies—if she would not go along [with his plan to set up a trust] . . ., that I would be forced to sell the home, take the $150,000 that I felt . . . was my part . . . .

(Tr. of 11/8/00 at 56).

> I had taken my 150 that I thought was mine.

(Tr. of 11/8/00 at 60).

## DISCUSSION

### 11 U.S.C. § 727(a)(5)

11 U.S.C. § 727(a)(5) provides that the debtor shall be granted a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this para-

graph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

The plaintiff has the burden of introducing evidence of the disappearance of assets or of unusual transactions. The burden then shifts to the defendant to satisfactorily explain the loss or deficiency of assets. The test under this subsection relates to the credibility of the proffered explanation, not the propriety of the disposition. An explanation is not satisfactory if it is not offered in good faith or if it is vague, indefinite and uncorroborated.

*In re Maletta,* 159 B.R. 108, 116 (Bankr. D.Conn.1993) (citations omitted). The standard of proof is a preponderance of the evidence. *Id.* at 111.

The trustee satisfied her burden by her effective cross-examination of the debtor, which demonstrated, *see supra* at 665–66, that he could not recall any details to support his claim that he lost $130,000 in a winner-take-all stud poker game. A person who loses $130,000 in a poker game would be expected to have some recollection of the details of the event which could be corroborated, or at least a credible explanation for why he did not.

■ For the same reasons that the trustee has satisfied her burden of proof, the debtor has not. Although the debtor attempted to excuse his inability to recall any details on the claim that he was suffering from depression, he did not provide a scintilla of evidence to support that claim, such as a medical report or a witness testifying that he was in poor health. Apparently, his alleged condition did not interfere with his decision to reserve at least $11,000 for a Caribbean vacation, which supports the trustee's suspicion that he deposited money in offshore banks. The fact that the debtor withdrew the money over a period of months further supports

the conclusion that he was formulating a plan to hide it from his wife.

All the debtor offered the court was his self-serving testimony. That is not acceptable.

His attitude appeared to be that his generál statements should just be accepted as sufficient and that he need not be bothered to supply the details. He supplied no documents or records of any kind to the Trustee that relate to the use and loss of the funds and could supply no dates or times during which he gambled or drank. His almost complete inability to recall any of those details is not explained by depression or anger.

*In re Murphy,* 244 B.R. 418, 421–22 (Bankr.N.D.Ohio 2000) (denying discharge).

■ It is appropriate for a trustee to be suspicious of an unsupported claim that money which would be property of a bankruptcy estate was gambled because of "the relative ease in which such claims may be used to explain substantial deficiencies in assets at the time of the bankruptcy filing." *In re Carter,* 274 B.R. 481, 485 (Bankr.S.D.Ohio 2002) (citations omitted). Accordingly, "many cases and authorities uniformly hold that a Debtor's explanation that the diminution of his assets were as a result of unsubstantiated gambling losses is an unsatisfactory explanation." *In re Rowe,* 81 B.R. 653, 657 (Bankr.M.D.Fla. 1987); *see also, e.g., Carter,* 274 B.R. at 481; *In re Barman,* 244 B.R. 896 (Bankr. E.D.Mich.2000); *In re Burns,* 133 B.R. 181 (Bankr.W.D.Pa.1991); *In re McMahon,* 116 B.R. 857 (Bankr.M.D.Fla.1990); *In re Gallini,* 96 B.R. 491 (Bankr.M.D.Pa.1989). "The underlying premise is that since bankruptcy is a privilege, creditors are defrauded where significant funds are missing and the only excuse offered is that they were lost gambling." *Carter,* 274 B.R. at 485.

## 11 U.S.C. § 727(a)(2)(A)

11 U.S.C. § 727(a)(2)(A) provides in relevant part:

The court shall grant the debtor a discharge, unless—

.　　.　　.　　.　　.

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition . . . .

■ A plaintiff under § 727(a)(2)(A) must demonstrate that the act in question "occurred within one year prior to the commencement of the case; was performed with the actual intent to defraud a creditor or officer of the estate; was the act of the debtor or an agent of the debtor; and involved concealing, destroying, transferring, or removing any property of the debtor or permitting any of these acts to be done." *Maletta*, 159 B.R. at 115–16.

■ The debtor's schedules listed his former wife as a creditor, with a debt that is nearly all of his total liabilities. The parties agree that the alleged gambling occurred within one year of the bankruptcy filing. (Tr. of 4/21/04 at 10:35 a.m.).

As noted *supra* at 666, the debtor's testimony demonstrated he was angered by his former wife for breaking an alleged agreement not to divorce him, and he believed he was entitled to the $150,000. So, he took money he had been ordered to turn over to a state court escrow fund, *see supra* at n. 1, and lost it in a poker game. In the best light, it was his intention to take a chance on either increasing the money, which would enable him to satisfy the court order and still keep the original

amount, or lose it all. He cavalierly explained that his plan "didn't work out":

[A friend] told me about this gambling situation. I went to try to double the money so that I would have money for my medical and pay them off [his former wife and/or the court ordered escrow] before the 25th. It didn't work out. I lost. I then went on that vacation for ten grand or whatever it was.

(Tr. of 11/8/00 at 78). The debtor's testimony demonstrated he did not care that he lost the money because he believed it was his to lose and that his wife had no right to it.

■ Bankruptcy is a privilege, not a right. As this court has observed:

A two-fold objective is sought by bankruptcy law and policy that governs chapter 7. Debtors are given a fresh start in the form of allowable exemptions and a discharge of dischargeable debts, and creditors are given a equitable distribution from any remaining property of the debtor's bankruptcy estate. Of course, the underlying premise in bankruptcy is that the debtor is honest and therefore entitled to that relief. Courts must scrutinize with care any challenge to that premise, and if it is shown to be unfounded, the discharge must be denied. Nothing is more corrosive to the achievement of bankruptcy objectives than the perception that creditors are unpaid or under paid while the debtor enjoys the benefit of hidden or improperly shielded assets.

*Maletta*, 159 B.R. at 111.

### Conclusion

For the foregoing reasons, IT IS ORDERED that the debtor's discharge is denied under 11 U.S.C. § 727(a)(2)(A) & (5).